# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY

| | | |
|---|---|---|
| CHRIS MCHENRY,<br>Administrator of the Estate<br>of Joseph Jennings, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CITY OF OTTAWA, KANSAS, | ) ) | |
| THE BOARD OF COMMISSIONERS<br>FOR FRANKLIN COUNTY, KANSAS, | ) ) ) | |
| ABE "A. J." SCHMIDT, | ) ) | |
| JESSE VEGA, | ) ) | |
| RICKY WILSON, | ) | Case No. 2:16-cv-2736 |
| JUSTIN BULCOCK, | ) ) | |
| CASEY GILMORE, | ) ) | |
| DOUG WATERMAN, | ) ) | |
| BRYCE HART, | ) ) | |
| DEREK BUTTERS, | ) ) | |
| HUNTER DRYDEN, | ) ) | |
| and | ) ) | |
| DWAYNE WOODS, | ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Chris McHenry ("McHenry"), for his Complaint against defendants City of

Ottawa, Kansas ("City of Ottawa"), Franklin County, Kansas by and through The Board of

County Commissioners for Franklin County, Kansas ("Franklin County"), Abe "A.J." Schmidt ("Schmidt"), Jesse Vega ("Vega"), Ricky Wilson ("Wilson"), Justin Bulcock ("Bulcock"), Casey Gilmore ("Gilmore"), Doug Waterman ("Waterman"), Bryce Hart ("Hart"), Derek Butters ("Butters"), Hunter Dryden ("Dryden"), and Dwayne Woods ("Woods"), states as follows:

### NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE

1.      In the early evening of August 23, 2014, near the Orscheln Farm and Home parking lot located at 2008 S. Princeton in Ottawa, Kansas, Joseph Jennings was killed after being shot multiple times by officers of the City of Ottawa police department and deputy sheriffs of the Franklin County sheriff's department.  Although Mr. Jennings was completely unarmed, he was committing no crime, and he was not a threat to anyone, defendants Schmidt, Vega, Wilson, Bulcock, and Gilmore killed Mr. Jennings by firing their weapons a total of at least 29 times.  Upon information and belief, defendants Waterman, Hart, Butters, Dryden and Woods were present and actively involved in the incident, but they did not fire their weapons.

2.      This is a civil action for redress of Joseph Jennings' rights under the Fourth and Fourteenth Amendments of the United States Constitution and for wrongful death.  Plaintiff brings this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1983 ("section 1983") the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq. (the "ADA"); the Rehabilitation Act of 1973, 29 U.S.C. §794 (the "Rehabilitation Act"); and the Kansas Wrongful Death Statute, K.S.A. §60-1901 et seq. (the "Wrongful Death Statute").

3.      Plaintiff McHenry is a Kansas resident and is the duly-appointed administrator of the Estate of Joseph Jennings, deceased, pending in the Probate Division of the District Court of Franklin County, Kansas, 14PR141.  Plaintiff McHenry is also the brother of Joseph Jennings and is an heir at law under the Kansas Wrongful Death Statute, K.S.A. §60-1901 et seq.

4.     Defendant City of Ottawa is a city organized under the laws of the State of Kansas.  It is authorized to sue and to be sued in its corporate name.

5.     Defendant Board of Commissioners for Franklin County, Kansas is a governmental entity organized under the laws of the State of Kansas.  It is the legislative authority with administrative oversight of the Franklin County Sheriff's Office and it has the legal authority to sue and to be sued.

6.     Defendant Schmidt, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

7.     Defendant Vega, at the time of the events alleged in this Complaint, was a deputy sheriff with the Franklin County Sheriff's Office.

8.     Defendant Wilson, at the time of the events alleged in this Complaint, was a deputy sheriff with the Franklin County Sheriff's Office.

9.     Defendant Bulcock, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

10.     Defendant Gilmore, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

11.     Defendant Waterman, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

12.     Defendant Hart, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

13.     Defendant Butters, at the time of the events alleged in this Complaint, was a police officer with the City of Ottawa Police Department.

14.    Defendant Dryden, at the time of the events alleged in this Complaint, was a deputy sheriff with the Franklin County Sheriff's Office.

15.    Defendant Woods, at the time of the events alleged in this Complaint, was a deputy sheriff with the Franklin County Sheriff's Office.

16.    This Court has personal jurisdiction over the parties because all of the defendants are residents of the State of Kansas and/or because all of events and acts alleged in this Complaint took place and were committed by the defendants in the State of Kansas.

17.    This Court has subject matter jurisdiction over Plaintiff's claims brought under section 1983, the ADA, and the Rehabilitation Act pursuant to 28 U.S.C. §1343(3) and 28 U.S.C. §1331.  This Court has supplemental subject matter jurisdiction over Plaintiff's claims brought under the Kansas Wrongful Death Statute pursuant to 28 U.S.C. §1367.

18.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

19.    Joseph Jennings was born on December 31, 1995 and at the time of his death he was 18 years old.

20.    From the time he was around eight or nine years old, Joseph Jennings had very little contact with his natural parents and he lived with various foster parents.  From approximately 2010 to 2012, Ms. Brandy Smith was one of Mr. Jennings' foster parents.  Ms. Smith was not related by blood to Joseph Jennings, but Ms. Smith's brother was married to one of Mr. Jennings' sisters.

21.    During 2010 to 2012, and later in 2014 until the date of his death, Mr. Jennings lived with Ms. Smith and her husband, Mr. William "Billy" Bruton, at their home in Ottawa,

Kansas.  Mr. Jennings frequently referred to Brandy Smith and Billy Burton as his aunt and uncle.

22.     Prior to his death, Joseph Jennings had a history of mental illness, and he suffered with depression, anxiety disorder, bipolar disorder and pseudo seizures.

23.     Less than seven months before his death, on January 29, 2014 Joseph Jennings attempted suicide by intentionally overdosing on his prescription medications of trazodone and Atvian together with alcohol.  Mr. Jennings was treated for his drug overdose and alcohol intoxication at Ransom Memorial Hospital in Ottawa, Kansas and then released.

24.     The evening before his death, on August 22, 2014, Joseph Jennings again attempted to take his own life by intentionally overdosing on his prescription medications of trazodone and Atvian.  At that time, Mr. Jennings was living with Brandy Smith and Billy Bruton at their residence located at 1941 S. Princeton, Ottawa, Kansas.  Ms. Smith called 911 for emergency assistance.  Three Ottawa police officers, defendants Schmidt, Bulcock and Butters, responded to the call and assisted in taking Mr. Jennings to Ransom Memorial Hospital in Ottawa for emergency treatment.

25.     The hospital treated Mr. Jennings for a drug overdose and possible suicide attempt.  The following afternoon, August 23, 2014, Mr. Jennings was released from the hospital even though he was still extremely distraught and emotionally upset.

26.     After his discharge from the hospital, Mr. Jennings went back home and he tried to rest for the remainder of the afternoon.  Still upset in the early evening, he tried to engage in several activities both alone and with his uncle, Mr. Bruton, in an effort to calm down, but none of the activities helped.  He eventually told Mr. Bruton that he wanted to be alone and go for a walk to the nearby McDonalds restaurant.

5

27.     Mr. Jennings walked to the Orscheln Farm and Home parking lot which was located immediately across the street on Princeton and west of Ms. Smith's and Mr. Bruton's home.

28.     At approximately 7:50 in the evening on August 23rd, Mr. Jennings called 911 from his cell phone.  Mr. Jennings falsely reported to the Franklin County dispatcher that there was a man standing in the Orscheln's parking lot with a black handgun that he had pulled out of his shirt, waved it around himself once, cocked it, and put it back in his shirt.  Mr. Jennings described the man as a younger white male six feet tall, weighing 170 pounds, without much hair, and wearing a blue shirt and white pants.  Although Mr. Jennings identified himself to the dispatcher as the caller, Mr. Jennings did not inform the dispatcher that he was actually describing himself as the man standing in the Orscheln parking lot.

29.     The dispatcher immediately forwarded the report to responding officers from the Ottawa police department and the Franklin County sheriff's department.  The responding officers were instructed to respond without lights and sirens unless the man in the parking lot was doing something criminal because open carry and concealed carry with a permit was legal in Kansas.

30.     Almost immediately, officers began arriving at the Orscheln store parking lot.  Although some of the initial responding officers arrived without their lights and sirens activated as instructed, additional units arrived with their lights and sirens on.

31.     Within a few minutes, a total of at least ten law enforcement officers arrived at the scene, including all of individual defendants in this action.

32.     Upon arriving at the scene, the officers observed Mr. Jennings as the individual who had been described to the 911 dispatcher.  However, the officers did not see that Mr. Jennings was carrying a gun.  They saw that Mr. Jennings' left hand was tucked inside his

waistband, but his right hand was free.  They further observed that Mr. Jennings was pacing calmly and quietly in a sideways and sometimes backwards motion.

33.    The officers immediately recognized that the individual was Joseph Jennings. Many of the officers were familiar with Mr. Jennings and they called him out by his first name. Three of the officers, defendants Schmidt, Bulcock and Butters, were the officers who helped take Mr. Jennings to Ransom Memorial Hospital for his suicide attempt the previous evening.

34.    One of the officers told Mr. Jennings, "Joe, you're not in any trouble" and that they just wanted to talk.  The officers further instructed Mr. Jennings to "show us your hands." Mr. Jennings did not respond.  Rather, he remained completely quiet and he continued to calmly walk back and forth.

35.    The officers repeatedly demanded that Mr. Jennings show both of his hands. Each time, Mr. Jennings did not comply with their demands but he remained completely calm and quiet.  He continued to walk sideways and even away from the officers with his left hand still in his waistband.

36.    At this same time, the officers started to point their patrol rifles at Mr. Jennings, and they started to assume defensive crouching positions and hide behind the corner of the Orscheln building and their vehicles.

37.    The officers also started to secure the scene.  Most of the officers were positioned directly to the west of Mr. Jennings, many yards away.  At least one officer, defendant Wilson, took a position to the south and east of Mr. Jennings, closer to Princeton Street.

38.    Even though Mr. Jennings was entirely quiet and calm, the officers grew frustrated that Mr. Jennings would not comply with their demands to show both of his hands. Various officers began yelling at Mr. Jennings, and they made new demands that Mr. Jennings

7

get down on the ground. Defendant Vega even yelled at Mr. Jennings, "If you do anything, I'm going to kill you."

39.     Despite the increased rhetoric and stress from the officers, Mr. Jennings remained calm and quiet.

40.     Around this period of time, Mr. Bruton was in his front yard working on his motorcycle. He observed what was transpiring between the officers and Joseph Jennings across the street and he immediately rushed over. He shouted that Joseph was his nephew and he requested that he be allowed to talk to him. The officers refused and demanded that Mr. Bruton leave. Mr. Bruton went back to his home and he immediately returned with his wife, Brandy Smith.

41.     Ms. Smith and Mr. Bruton both implored the officers to let them handle the situation with their nephew. They said that the officers knew Joseph and he just wanted them to shoot him. Ms. Smith also insisted that if Joseph had a gun, it was "only a BB gun".

42.     Ms. Smith and Mr. Bruton were only a few feet away from Joseph Jennings, and they asked the officers to let Mr. Bruton tackle Joseph or to "take him down". The officers became extremely upset and yelled at them to "get the f*** out of here."

43.     Now completely frustrated and upset, the officers decided to press the issue. Although a tazer cartridge was later recovered at the scene, it is unclear if or when any of the officers attempted to taze Mr. Jennings. The officers definitely decided, however, to "beanbag" Mr. Jennings with a shotgun. Defendant Butters retrieved a beanbag shotgun and pointed it at Mr. Jennings.

44.     For the first and only time during the entire incident, Mr. Jennings spoke. Upon seeing the beanbag shotgun, Mr. Jennings yelled back, "Don't beanbag me, m**f**er!"  Mr.

8

Jennings also started to walk backwards, away from defendant Butters and several of the other officers.

45.     The officers moved towards Mr. Jennings as he walked backwards, all the time pointing their weapons towards him.

46.     Defendant Butter then fired a first beanbag at Mr. Jennings, which struck him on his right shoulder.  Mr. Jennings made absolutely no reaction to being struck with the first beanbag and he said nothing.

47.     Very quickly thereafter, defendant Butters fired a second beanbag which struck Mr. Jennings near his right hip.  This second beanbag partially knocked Mr. Jennings down.  Mr. Jennings came up, pulled his left hand out of his waistband and started to point his hand toward the several officers located to his west.

48.     Almost immediately, five of the officers, defendants Schmidt, Vega, Wilson, Bulcock, and Gilmore fired their weapons, killing Mr. Jennings.  A total of at least 29 shots were fired, of which approximately eight or nine bullets struck Mr. Jennings.

49.     Perhaps as many as eight shots were fired by defendant Wilson from his position located to the south and east and behind Mr. Jennings. Several of the bullets entered the backside of Mr. Jennings, striking the back of his head, the right side of his back and his right buttock.

50.     In addition, the officers were so careless and reckless that several of the bullets missed Mr. Jennings entirely, travelled across the street, and struck a neighboring home at 2015 S. Princeton Street.  One of the bullets was later found lodged in a baby's pillow in the living room, another bullet in a window valance, and another bullet in an outside shutter.

51.     After the shooting, the officers said that they fired their weapons because they believed they saw a black object in Mr. Jennings' left hand which they believed to be a gun.

They were wrong. Upon approaching Mr. Jennings' body on the ground, they saw that the black object was a pair of sunglasses and that Mr. Jennings was carrying no gun at all.

52.     The officers shot and killed Joseph Jennings directly in front of aunt and uncle, Brandy Smith and Billy Bruton, who were standing mere yards away and who had pleaded with the officers not to shoot him. Ms. Smith became so hysterical from witnessing the shooting that the officers handcuffed her.

53.     All told, from the time the Franklin County dispatcher first received the 911 call until the time Joseph Jennings was shot and killed, the entire incident lasted less than 17 minutes.

54.     At no time during the entire incident did Mr. Jennings have in his possession a handgun or any weapon of any kind.

55.     At no time during the entire incident did any of the defendants ever ask Mr. Jennings whether he had a handgun or a weapon.

56.     At no time during the entire incident did Mr. Jennings ever state that he intended to harm any of the officers or deputies or anyone else.

57.     Prior to being beanbagged the second time by the defendants, Mr. Jennings never said anything to the officers nor did he take any kind of threatening action.

## COUNT I
## CLAIM AGAINST DEFENDANTS SCHMIDT, VEGA, WILSON, BULCOCK AND GILMORE FOR THE UNCONSTITUTIONAL USE OF EXCESSIVE AND DEADLY FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. §1983

Plaintiff McHenry, as administrator of the Estate of Joseph Jennings, for Count I of his Complaint against separate defendants Schmidt, Vega, Wilson, Bulcock and Gilmore, states as follows:

58.    Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 57 of his Complaint as if set out in full.

59.    Defendants Schmidt, Vega, Wilson, Bulcock, and Gilmore were personally present and they were actively involved in the incident on the evening of August 23, 2014 which resulted in the shooting death of Joseph Jennings.  Throughout the incident, defendants Schmidt, Vega, Wilson, Bulcock and Gilmore acted under color of state law.

60.    Defendants Schmidt, Vega, Wilson, Bulcock and Gilmore collectively fired their weapons against Joseph Jennings a total of at least 29 times, killing Mr. Jennings.

61.    At the time of the incident on August 23, 2014, Joseph Jennings had a clearly established constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments of the United States Constitution.

62.    Defendants Schmidt, Vega, Wilson, Bulcock and Gilmore violated Mr. Jennings' constitutional right to be free from excessive force.  The actions of defendants Schmidt, Vega, Wilson, Bulcock and Gilmore were not objectively reasonable in light of the facts and circumstances confronting them in that:

a.    Mr. Jennings had committed no crime or illegal act.  Even if Mr. Jennings had a gun in his possession – which he undeniably did not – at the time of the incident all of the officers were specifically advised and they were aware that "open carry" was entirely legal in the State of Kansas.  Moreover, "concealed carry" was also legal in the State of Kansas with a permit, but none of the defendants took any actions to confirm whether Mr. Jennings had such a permit.

b.    Mr. Jennings was not armed with a handgun or weapon of any kind, and defendants failed to take reasonable steps to ascertain that Mr. Jennings, in fact, was not

11

carrying a weapon.  Throughout the entire incident, the defendants never asked Mr. Jennings whether he had a weapon.  To the contrary, during the incident, Mr. Jennings' aunt, Brandy Smith, expressly told the defendants that if Mr. Jennings had a gun, it was "only a BB gun".

c.      There was no immediate threat to the safety of the officers or others during the entire incident.  The officers had secured the scene and there were no nearby bystanders (other than his aunt or uncle) who were in danger.  At no time did Mr. Jennings attempt to flee or evade the officers.  The officers were also in protective gear, as far as 30 yards away, and in protected positions behind the east corner of the Orscheln building, a patrol vehicle and a minivan. At no time throughout the entire incident did Mr. Jennings ever state that he intended to harm anyone.  To the contrary, Mr. Jennings was completely quiet throughout the incident until the defendants pulled out and pointed a bean bag shotgun toward him at which time Mr. Jennings then yelled, "Don't beanbag me, m**f**."  Prior to that time, Mr. Jennings calmly paced back and forth sideways and even away from the officers.  Immediately prior to being beanbagged and then being shot at least 29 times, Mr. Jennings was in fact moving backwards away from the officers.

d.      Although the officers fully knew that Mr. Jennings was mentally ill, emotionally upset and suicidal, they failed to utilize appropriate and well-established Crisis Intervention techniques.  They failed to have at the scene an officer or individual with proper Crisis Intervention training who took charge of the situation.  They further refused to allow Mr. Jennings' aunt and uncle to calmly talk and negotiate with Mr. Jennings.

e.     The defendants' own reckless or deliberate conduct during the incident unreasonably created any perceived need to use excessive and deadly force.   Mr. Jennings was completely calm and quiet until the defendants pointed the beanbag shotgun at him.   The defendants exacerbated and escalated what would have otherwise been a calm situation.   Such reckless and deliberate conduct included: their encroachment on Mr. Jennings' space, their loud and profane commands, including yelling at Mr. Jennings that "If you do anything I will kill you"; their refusal to allow Mr. Jennings' aunt and uncle to talk with Mr. Jennings and to take care of the situation; their arrival at the scene with their sirens and lights activated; their pointing of their assault rifles at Mr. Jennings throughout the incident; and their unnecessary and premature use of the beanbag shotgun which could only anger, hurt and provoke Mr. Jennings.

f.     Mr. Jennings was shot a total of 29 times, an amount that was certainly excessive under the circumstances.

g.     Perhaps as many as eight of the shots were fired by defendant Wilson from his position located to the south and east and behind Joseph Jennings.   Facing the opposite direction, Mr. Jennings was absolutely no threat of any kind to defendant Wilson.   At least three of the bullets which struck Mr. Jennings entered his back side.

h.     From beginning to end, the entire incident lasted no more than 17 minutes. There existed absolutely no rush or urgency in their dealings with Mr. Jennings.   Since Mr. Jennings was not a threat to anyone and he had committed no crime, the defendants could have taken as long as necessary to calmly talk to Mr. Jennings and diffuse the situation.

i.    The defendants' conduct was so careless and reckless that several of the bullets were fired into a neighboring house across the street.  One of the bullets was found lodged in a baby's pillow in the living room.

j.    There did not appear to be one officer who took tactical control of the entire incident.  As a result, there did not exist any kind of coordinated or well-thought out plan as to how to calmly handle and diffuse the situation.

63.    As a direct and proximate result of the defendants' wrongful conduct and failure to act, Joseph Jennings was needlessly shot and killed and he suffered permanent damages.

64.    Defendants' conduct was intentional, reckless, wanton and malicious so as to justify an award of punitive damages.

**WHEREFORE,** Plaintiff prays for judgment against defendants Schmidt, Vega, Wilson, Bulcock and Gilmore for compensatory damages in such sum as is fair and reasonable but which are in excess of $75,000, an award of punitive damages in an amount to be determined by the trier of fact, prejudgment interest as provided by law and for Plaintiff's costs, expenses and attorneys' fees pursuant to 42 U.S.C. §1988.

## COUNT II
## CLAIM AGAINST DEFENDANTS WATERMAN, HART, BUTTERS, DRYDEN AND WOODS FOR THE UNCONSTITUTIONAL USE OF EXCESSIVE AND DEADLY FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. §1983

Plaintiff McHenry, as administrator of the Estate of Joseph Jennings, for Count II of his Complaint against separate defendants Waterman, Hart, Butters, Dryden and Woods, states as follows:

65.    Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 64 of his Complaint as if set out in full.

66.     Defendants Waterman, Hart, Butters, Dryden and Woods were personally present and they were actively involved in the incident on the evening of August 23, 2014 which resulted in the shooting death of Joseph Jennings.  Throughout the incident, defendants Waterman, Hart, Butters, Dryden and Woods acted under color of state law.

67.     Upon information and belief, defendants Waterman, Hart, Butters, Dryden and Woods did not actually fire their weapons during the incident.  However, defendants Waterman, Hart, Butters, Dryden and Woods are also personally liable for the other individual defendants' use of excessive and deadly force because they actively participated in the incident, and they failed to intervene to prevent the other officers' use of excessive and deadly force against Joseph Jennings.

68.      The actions of defendants Waterman, Hart, Butters, Dryden and Woods were not objectively reasonable in light of the facts and circumstances confronting them because they personally observed and had reason to know that the other defendants were about to use excessive force against Joseph Jennings.  Although they had ample opportunity to do so, they took no actions to prevent the defendants from using excessive force.  They also helped to create the very environment which caused the other defendants to shoot and kill Mr. Jennings.

69.     As a direct and proximate result of the defendants' wrongful conduct and failure to act, Joseph Jennings was needlessly shot and killed and he suffered permanent damages.

70.     Defendants' conduct was intentional, reckless, wanton and malicious so as to justify an award of punitive damages.

**WHEREFORE,** Plaintiff prays for judgment against defendants Waterman, Hart, Butters, Dryden, and Woods for compensatory damages in such sum as is fair and reasonable but which are in excess of $75,000, an award of punitive damages in an amount to be determined by

the trier of fact, prejudgment interest as provided by law and for Plaintiff's costs, expenses and attorneys' fees pursuant to 42 U.S.C. §1988.

<strong>COUNT III</strong><br>
<strong>CLAIM AGAINST DEFENDANTS CITY OF OTTAWA AND FRANKLIN COUNTY FOR MUNICIPAL LIABILITY FOR THE UNCONSTITUTIONAL USE OF EXCESSIVE AND DEADLY FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. §1983</strong>

Plaintiff McHenry, as administrator of the Estate of Joseph Jennings, for Count III of his Complaint against separate defendants City of Ottawa and Franklin County, states as follows:

71.     Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 70 of his Complaint as if set out in full.

72.     Defendants City of Ottawa and Franklin County have liability under section 1983 because they had a policy or custom that directly caused the deprivation of Joseph Jennings' constitutional right to be free from the excessive use of force.  Defendants City of Ottawa and Franklin County had such a policy or custom in that they inadequately trained or supervised their employees in how to deal with persons who are suicidal, mentally ill or who are in other crisis situations so as to minimize the risk of harm to the persons being investigated or arrested, the officers themselves, and the members of the public.

73.     In 1988, the Memphis police department developed the nationally-recognized "Memphis Model" for appropriately dealing with such situations.  Since at least that date, the defendants have been well aware of the high frequency of encounters between law enforcement officers and persons who are suicidal, mentally ill, or in other crisis situations and how traditional law enforcement techniques are wholly inadequate to diffuse the dangerousness of such situations.  Although the City of Ottawa and Franklin County have been fully aware of the critical importance for Crisis Intervention Training, or "CIT", for its officers and deputies, the

defendants have failed to adequately train and supervise its employees in such essential CIT. Although such CIT is readily available in the state of Kansas with the Kansas Law Enforcement CIT Council, and such training may even be subsidized, upon information and belief the City of Ottawa has sent only one of its officers for such CIT and Franklin County has sent none of its deputies for CIT.

74.    As alleged in Counts I and II above, the individual defendant officers and deputies exceeded their constitutional limitations on the use of force.

75.    The individual defendants' use of excessive force against Mr. Jennings arose under circumstances that constitute a usual and recurring situation with which law enforcement officers must deal; namely, encountering persons who are suicidal, mentally ill, or in a crisis situation, regardless of whether a crime has been committed.

76.    The inadequate training demonstrates a deliberate indifference on the part of defendants City of Ottawa and Franklin County towards such persons with whom their officers and deputies come into contact.

77.    There exists a direct causal link between the constitutional deprivation of Mr. Jennings' rights and the inadequate training by the City of Ottawa and Franklin County.

78.    As a direct and proximate result of the defendants' wrongful conduct and failure to act, Joseph Jennings was needlessly shot and killed and he suffered permanent damages.

79.    Defendants' conduct was intentional, reckless, wanton and malicious so as to justify an award of punitive damages.

**WHEREFORE,** Plaintiff prays for judgment against defendants City of Ottawa and Franklin County for compensatory damages in such sum as is fair and reasonable but which are in excess of $75,000, an award of punitive damages in an amount to be determined by the trier of

fact, prejudgment interest as provided by law and for Plaintiff's costs, expenses and attorneys' fees pursuant to 42 U.S.C. §1988.

## COUNT IV
## CLAIM AGAINST ALL DEFENDANTS FOR DAMAGES UNDER THE ADA, 42 U.S.C. §12101 ET SEQ. AND THE REHABILITATION ACT, 29 U.S.C. §794

Plaintiff McHenry, as administrator of the Estate of Joseph Jennings, for Count IV of his Complaint against all defendants, states as follows:

80.     Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 79 of his Complaint as if set out in full.

81.     Defendants City of Ottawa and Franklin County constitute "public entities" as defined in the ADA and the Rehabilitation Act.

82.     Joseph Jennings was a qualified individual with a disability under the ADA and the Rehabilitation Act.  As an individual diagnosed with anxiety disorder, depression, bipolar disorder and pseudo seizures, Mr. Jennings had a mental impairment that substantially limited one or more of his major life activities.

83.     The defendants knew of Joseph Jennings' disability.  Mr. Jennings was personally known by the defendants.  Three of the defendants who personally involved in the shooting incident on August 23, 2014 - officers Butters, Schmidt and Bulcock - took Mr. Jennings the previous evening to Ransom Memorial Hospital for his prescription drug overdose and suicide attempt.  The defendants further knew that Mr. Jennings was mentally and emotionally disturbed because they believed that Mr. Jennings wanted to commit "suicide by cop" during the incident on August 23, 2014.

84.     During their investigation into Joseph Jennings' conduct on the evening of August 23, 2014, the defendants either: (1) incorrectly perceived the effects of Mr. Jennings' disability

as illegal conduct; and/or (2) failed to reasonably accommodate Mr. Jennings' disability, causing

Mr. Jennings to suffer greater injury or indignity in that process than other persons.

85.    As a result of the defendants' actions, Joseph Jennings was either excluded from

participation in or denied the benefits of some the defendants' law enforcement services,

programs, or activities, or he was otherwise discriminated against by the defendants.

86.    Joseph Jennings' exclusion, denial of benefits, or discrimination was by reason of

Mr. Jennings' disability.

87.    As a direct and proximate result of the defendants' conduct, Joseph Jennings was

needlessly shot and killed and he suffered permanent damages.

**WHEREFORE,** Plaintiff prays for judgment against all defendants in such sum as is fair

and reasonable but which are in excess of $75,000, prejudgment interest as provided by law and

for Plaintiff's costs, expenses and attorneys' fees pursuant to 42 U.S.C. §12205 and 29 U.S.C.

§794(a).

**COUNT V**
**CLAIM AGAINST DEFENDANTS SCHMIDT, VEGA, WILSON, BULCOCK, GILMORE, CITY OF OTTAWA AND FRANKLIN COUNTY FOR WRONGFUL DEATH BASED ON BATTERY**

Plaintiff McHenry, as an heir of Joseph Jennings, for Count V of his Complaint against

defendants Schmidt, Vega, Wilson, Bulcock, Gilmore, City of Ottawa and Franklin County,

states as follows:

88.    Plaintiff incorporates by reference herein the allegations contained in paragraphs

1 through 87 of his Complaint as if set out in full.

89.    The Kansas Wrongful Death Statute provides in K.S.A. 60-1901 that, "If the

death of a person is caused by the wrongful act or omission of another, an action may be

maintained for the damages resulting therefrom if the former might have maintained the action had he or she lived . . . against the wrongdoer . . ."

90.    Plaintiff is an heir at law of Joseph Jennings who is entitled to bring an action for the wrongful death of Joseph Jennings pursuant to K.S.A. 60-1902.

91.    The remaining heirs at law of Joseph Jennings are: Joshua McHenry, Danielle Brown, David McHenry, Brian Trober, Hope Jennings and Isaiah Jennings.

92.    Defendants Schmidt, Vega, Wilson, Bulcock, and Gilmore committed a battery against Joseph Jennings which resulted in his death when they intentionally shot and killed Mr. Jennings without privilege during the incident on August 23, 2014.

93.    All of the wrongful acts or omissions of the individual defendants during the shooting incident on August 23, 2014 were committed with the scope of their employment as officers of the City of Ottawa Police Department and the Franklin County Sheriff's Office. Consequently, defendants City of Ottawa and Franklin County are liable for damages caused by the negligent and/or wrongful acts or omissions of their employees under the Kansas Tort Claims Act, K.S.A. 75-6103.

94.    The defendants owed special duties to Joseph Jennings not to use excessive force during their investigation or arrest of Mr. Jennings and to reasonably accommodate Mr. Jennings' disability.  Further, the defendants' special duties to Mr. Jennings were mandatory, not discretionary, and consequently the defendants do not have immunity under Kansas Tort Claims Act, K.S.A. 75-6104.

95.    As a direct and proximate result of the defendants' wrongful actions in causing the death of Joseph Jennings, Plaintiff and the other heirs of Joseph Jennings have sustained the following injuries and damages:

a.   "Economic loss" including: (a) funeral expenses, and (b) *Wentling* damages for loss of parental services, attention, care, advice, protection, moral training, social training, educational assistance, nurturing, guidance and counseling; and

b.   "Non-economic loss" including: (a) mental anguish, suffering and bereavement; and (b) loss of society, companionship, and comfort.

96.   Defendants' conduct was intentional, reckless, wanton and malicious so as to justify an award of punitive damages.

**WHEREFORE,** Plaintiff prays for judgment against defendants Schmidt, Vega, Wilson, Bulcock, Gilmore, City of Ottawa and Franklin County in such sum as is fair and reasonable but which are in excess of $75,000, an award of punitive damages in an amount to be determined by the trier of fact, prejudgment interest as provided by law and for Plaintiff's costs of suit incurred herein.

**COUNT VI**
**CLAIM AGAINST ALL DEFENDANTS FOR WRONGFUL DEATH**
**BASED ON NEGLIGENCE**

Plaintiff McHenry, as an heir of Joseph Jennings, for Count VI of his Complaint against all defendants, states as follows:

97.   Plaintiff incorporates by reference herein the allegations contained in paragraphs 1 through 96 of his Complaint as if set out in full.

98.   As law enforcement officers, all of the defendants owed special and mandatory duties to Joseph Jennings to protect Mr. Jennings from injury, to not use excessive force, and to accommodate his disability.

99.   The defendants failed to exercise due care in the performance of their duties.

21

100.     As a result of the failure in the performance of their duties, Mr. Jennings suffered injury and was killed.

101.     All of the wrongful acts or omissions of the individual defendants during the shooting incident on August 23, 2014 were committed with the scope of their employment as officers of the City of Ottawa Police Department and the Franklin County Sheriff's Office. Consequently, defendants City of Ottawa and Franklin County are liable for damages caused by the negligent and/or wrongful acts or omissions of their employees under the Kansas Tort Claims Act, K.S.A. 75-6103.

102.     The special duties owed to Joseph Jennings were mandatory, not discretionary, and consequently the defendants do not have immunity under Kansas Tort Claims Act, K.S.A. 75-6104.

103.     As a direct and proximate result of the defendants' wrongful actions in causing the death of Joseph Jennings, Plaintiff and the other heirs of Joseph Jennings have sustained the following injuries and damages:

   a.  "Economic loss" including: (a) funeral expenses, and (b) *Wentling* damages for loss of parental services, attention, care, advice, protection, moral training, social training, educational assistance, nurturing, guidance and counseling; and

   b.  "Non-economic loss" including: (a) mental anguish, suffering and bereavement; and (b) loss of society, companionship, and comfort.

104.     Defendants' conduct was intentional, reckless, wanton and malicious so as to justify an award of punitive damages.

**WHEREFORE,** Plaintiff prays for judgment against all defendants in such sum as is fair and reasonable but which are in excess of $75,000, an award of punitive damages in an amount to be determined by the trier of fact, prejudgment interest as provided by law and for Plaintiff's costs of suit incurred herein.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

### REQUEST FOR DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial for this action.

Respectfully submitted,

**COLANTUONO BJERG GUINN, LLC**


By:  /s/ Robert J. Bjerg
ROBERT J. BJERG   KS #16702
7015 College Blvd., Suite 375
Overland Park, Kansas  66211
913.345.2555
913.345.2557 facsimile
bb@ksmolaw.com
Attorneys for Plaintiff