# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHRIS MCHENRY, Administrator
of the Estate of Joseph Jennings,
Deceased,

       Plaintiff,

v.

CITY OF OTTAWA, KANSAS, et al.,

       Defendants.

Case No.  16-2736-DDC-JPO

## MEMORANDUM AND ORDER

This matter comes before the court on two motions.  Defendants City of Ottawa, Kansas ("Ottawa"); Officers Abe Schmidt; Justin Bulcock; Casey Gilmore; Doug Waterman; Bryce Hart; and Derek Butters (collectively called the "Ottawa Defendants") have filed a Motion to Dismiss.  Doc. 29.  Defendants Franklin County, Kansas by and through the Board of County Commissioners for Franklin County, Kansas ("Franklin County"); Hunter Dryden; Jesse Vega; Ricky Wilson; and Dwayne Woods (collectively called the "Franklin Defendants") have filed a Motion for Judgment on the Pleadings.  Doc. 31.  The parties have filed responses and replies.  For reasons explained below, the court grants defendants' motions in part and denies them in part.  After identifying the governing facts, this order explains why.

## I.    Facts

The following facts come from plaintiff's First Amended Complaint (Doc. 21).[1]  Because the current dismissal motions rely on Federal Rules of Civil Procedure 12(b)(6) and 12(c), the court must accept the pleaded facts as true and view them in the light most favorable to plaintiff.

---

[1]    For simplicity, the court will refer to the First Amended Complaint as the "Complaint."

*See Ramirez v. Dep't of Corrs.*, 222 F.3d 1238, 1240 (10th Cir. 2000) (explaining that, on a motion to dismiss, the court must "accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff" (citation omitted)). The court emphasizes that this standard controls the facts at this stage of the case. In short, the court expresses no opinion whether they represent the facts that, ultimately, the fact finder would believe.

This lawsuit arises from the shooting of Joseph Jennings by Franklin County sheriff deputies and Ottawa police officers on the night of August 23, 2014. Mr. Jennings had a history of mental illness, including depression, anxiety disorder, bipolar disorder, and pseudo seizures. During the time relevant to this case, Mr. Jennings was living with Brandy Smith and Billy Bruton. Ms. Smith was one of Mr. Jennings's foster parents. On the evening of August 22, 2014, Mr. Jennings attempted to take his own life, but Ms. Smith called 911 before he could succeed. Officers Abe Schmidt, Justin Bulcock, and Derek Butters of the Ottawa Police Department responded to the emergency call and took Mr. Jennings to the hospital for treatment. On August 23, 2014, the hospital released Mr. Jennings.

After his release, Mr. Jennings still was upset. He tried to calm down both alone and with Mr. Bruton but to no avail. Eventually, Mr. Jennings told Mr. Bruton that he wanted to go for a walk alone. Mr. Jennings walked to the Orscheln Farm and Home parking lot in Ottawa, located directly across the street from Mr. Bruton and Ms. Smith's home. At about 7:50 p.m. on August 23, 2014, Mr. Jennings called 911 to report that a man in the Orscheln parking lot had pulled out a black handgun, waved it around once, cocked the gun, and then put the gun back in his shirt. When asked to describe the man, Mr. Jennings described himself. The 911 dispatcher did not know that Mr. Jennings, in effect, had made a 911 call to report himself.

Officers from both the Ottawa Police Department and the Franklin County Sheriff's Department responded to the call. The dispatcher told the officers to approach without lights and sirens because it is legal to carry a firearm openly in Kansas. Contrary to this instruction, some officers approached the location with lights and sirens. Within minutes of Mr. Jennings's 911 call, more than 10 officers had arrived at the scene, including all of the individual defendants. The responding officers included Officers Schmidt, Bulcock, and Butters, who had responded the night before to Mr. Jennings's first suicide attempt.

When they arrived at the scene, the officers saw Mr. Jennings. He matched the description of the man described in the 911 call. The officers also saw that Mr. Jennings's left hand was tucked inside his waistband. The officers called out to Mr. Jennings using his first name. One officer said: "Joe, you're not in any trouble," and he told Mr. Jennings that the officer just wanted to talk with him. The officer then asked to see Mr. Jennings's hands. Mr. Jennings did not respond. Instead, he paced back and forth, quietly and calmly.

Officers repeated their instructions, but again, Mr. Jennings did not respond. So, the officers began pointing their patrol rifles at Mr. Jennings. Officers positioned themselves about 30 yards away from Mr. Jennings and assumed defensive positions behind the corner of the Orscheln store and their patrol cars. The officers were wearing protective gear. Mr. Jennings never made any movement towards the officers. Officers continued to order Mr. Jennings to show his hands, but Mr. Jennings continued to keep his left hand in his waistband.

Mr. Bruton watched the scene across the street and once he realized that Mr. Jennings was the center of the attention, he ran toward him. Mr. Bruton asked the officers to talk with Mr. Jennings but they refused. Mr. Bruton went home and immediately returned with Ms. Smith. She also asked to speak to Mr. Jennings, explaining that Mr. Jennings wanted the officers to

shoot him.  And, she told the officers that if Mr. Jennings was armed, he possessed, at most, a

BB gun.  Mr. Bruton and Ms. Smith approached Mr. Jennings and asked the officers' permission

to tackle him.  In response, the officers instructed Mr. Bruton and Ms. Smith to leave the scene.

The officers then decided to try non-lethal force to subdue Mr. Jennings.[2]  Officer Butters

retrieved a beanbag gun from his patrol car.  When he saw the beanbag gun, Mr. Jennings said,

"Don't beanbag me, [expletive]."  This was the first and only time Mr. Jennings spoke.  Mr.

Jennings then backed away from Officer Butters and several other officers.  The officers

followed him with their weapons drawn.  Officer Butters fired a beanbag at Mr. Jennings, but it

did not affect him.

Officer Butters tried the beanbag gun again and, this time, the shot partially knocked Mr.

Jennings off his feet.  Mr. Jennings stood up, pulled his left hand out of his waistband, and

pointed his hand at several officers located to his west.  Later, officers asserted that they had seen

something black in Mr. Jennings's hand that looked like a gun.  Then, Officers Jesse Vega,

Ricky Wilson, Casey Gilmore, Schmidt, and Bulcock ("shooting officers") fired their weapons in

response.  Twenty-nine total shots were fired, and eight or nine of them struck Mr. Jennings.  Mr.

Jennings later died from these gunshot wounds.  Officers Doug Waterman, Bryce Hart, Hunter

Dryden, Dwayne Woods, and Butters ("non-shooting officers") were present at the scene, but

they did not fire their weapons.  Seventeen minutes elapsed from the time Mr. Jennings called

911 to the time he was killed.  After the shooting ended, officers discovered that the object Mr.

Jennings had pulled from his waistband was a pair of sunglasses, not a gun.

## II.    Claims Asserted

Plaintiff Chris McHenry, the administrator of the Estate of Joseph Jennings, has asserted

the following claims under 42 U.S.C. § 1983:  (1) excessive force violation against Officers

---

[2]        A TASER cartridge was recovered from the scene but it is unclear when it was used.

Schmidt, Vega, Wilson, Bulcock, and Gilmore—the shooting officers (Count I); (2) failure to intervene in the use of excessive force against Officers Waterman, Hart, Butters, Dryden, and Woods—the non-shooting officers (Count II); and (3) municipal liability for failing to train officers to use appropriate force asserted against the City of Ottawa and Franklin County (Count III). Plaintiff also brings a claim under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against all defendants (Count IV). Plaintiff also has asserted claims for wrongful death based on battery against Officers Schmidt, Vega, Wilson, Bulcock, Gilmore, the City of Ottawa, and Franklin County (Count V). Finally, plaintiff brings a claim against all defendants for wrongful death based on negligence (Count VI).

## III.    Legal Standard

The Ottawa Defendants have moved to dismiss all claims in the case under Fed. R. Civ. P. 12(b)(6). They assert that all claims fail to state a claim under Rule 12(b)(6). The Franklin Defendants have moved for judgment on the pleadings under Rule 12(c). Courts evaluate a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion to dismiss. *See Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012). The court thus will decide both motions together using the motion to dismiss standard.

On a motion to dismiss for failure to state a claim, the court accepts all facts pleaded by the non-moving party as true and draws any reasonable inferences in favor of the non-moving party. *Id.* "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 , 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original)).

Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court has explained, simply "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). This is so because the court need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 557 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (internal quotation omitted).

When evaluating a motion to dismiss under Rule 12(b)(6), the court may consider the Complaint itself along with any attached exhibits and documents incorporated into it by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180 (10th Cir. 2007); *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 964–65 (10th Cir. 1994)). A court also "'may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Id.* (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation omitted)). But, even where such documents exist, the governing cases permit the court to consider them—or not—as a matter of discretion. *Lowe v. Town of Fairland, Okla.*, 143 F.3d 1378, 1381 (10th Cir. 1998).

Here, the Ottawa and Franklin Defendants ask the court to consider video evidence they have submitted as part of the facts governing these two motions. Doc. 30 at 4–5; Doc. 42 at 7–8. The Franklin Defendants also refer to two additional documents in their motion: the County Prosecutor's report on the use of deadly force against Mr. Jennings and the criminal charges filed against Mr. Jennings when he was a minor. Doc. 32 at 10, 14. The court declines to consider any of these documents at this stage. None of the documents are attached as an exhibit or incorporated by reference into the Complaint. Nor are these documents central to plaintiff's claims.

The Ottawa Defendants urge the court to follow the logic of *Hyung Seok Koh v. Graf.*, No. 11-cv-2605, 2013 WL 5348326 (N.D. Ill. Sept. 24, 2013). In that case, the court considered a video submitted by defendants to support their motion to dismiss. *Id.* at *10. The video depicted the incident put at issue by the Complaint. *Id.* The court concluded it could consider the video based on the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007). *Id.* at *9. In *Scott*, the Supreme Court held a district court could consider a video to discredit a plaintiff's version of the facts, albeit at the summary judgment stage. *Scott*, 550 U.S. at 380. *Hyung* held that a court also properly could consider a video to decide a motion to dismiss, thus extending *Scott*'s holding and reasoning the video can "utterly discredit" plaintiff's allegations in the Complaint. *Id.* at *9.

The court declines to apply *Scott* as expansively as *Hyung Seok Koh* did. The standard governing a motion to dismiss differs from the one applied at summary judgment. At the summary judgment stage, the moving party must show that "no genuine dispute of material fact exists." *Scott*, 550 U.S. at 380. Once the moving party has carried that burden, the non-moving party must show there is more than "some metaphysical doubt as to the material facts." *Id.*

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Applying this logic to video evidence, *Scott* reasoned that when a video clearly shows "no genuine dispute of material fact" exists and the plaintiff is unable to produce other evidence to contradict the video's content, then summary judgment is appropriate. *See id.*

But, this reasoning does not fit a motion governed—as here—by the Rule 12(b)(6) standard. On a motion to dismiss, the court cannot compare the evidence that will govern the case at trial or even judge the motion by the summary judgment facts. The court cannot evaluate competing evidence to discern whether a genuine factual issue exists. Instead, the court must accept the facts pleaded by the non-moving party and draw any reasonable inferences in that party's favor. *Burke*, 698 F.3d at 1228. If the video evidence would end the litigation, then defendants, using the approach adopted by *Scott*, can file a motion for summary judgment and explain why the video dispels any material fact disputes. *See* Fed. R. Civ. P. 56(b), (d); *see also Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1110 (10th Cir. 2017) (holding plaintiff had not shown additional discovery was needed when he could not explain "how additional time would allow for rebuttal of the adversary's argument for summary judgment"). Given the limit of *Scott*'s holding, the standard governing this motion, and the availability of summary judgment procedure, the court, in its discretion, declines to consider the video tendered by defendants.[3]

---

[3] In one case, it appears that our court considered a video when deciding a motion to dismiss under Rule 12(b)(6). *Richard v. City of Wichita*, No. 15-1279-EFM-KGG, 2016 WL 5341756, at *5 (D. Kan. Sept. 23, 2016). But *Richard* considered the video's content to refute one of *movants'* arguments. *Richard* thus endorses considering a video when offered to defeat a Rule 12(b)(6) motion. And in any event, the court does not hold here that it would never consider a video tendered by the proponent of such a rule. Instead, it makes its decision as part of the discretion recognized in *Lowe* and similar cases. 143 F.3d at 1381.

## IV. Analysis

### A. Section 1983 Claims

Plaintiff asserts his first three claims under 42 U.S.C. § 1983. Doc. 21 at 10, 14, 16. The first one asserts that Officers Schmidt, Vega, Wilson, Bulcock, and Gilmore[4] used excessive lethal force in violation of the Fourth Amendment. Doc. 21 at 10. Plaintiff's second claim asserts that Officers Waterman, Hart, Butters, Dryden, and Woods failed to intervene to protect Mr. Jennings's constitutional rights.[5] Doc. 21 at 14. And third, plaintiff claims that Ottawa and Franklin County failed to train their officers how to use the correct amount of force. Doc. 21 at 16.

A defendant is liable under § 1983 if, under color of state law, the defendant deprives a person of a constitutional right. 42 U.S.C. § 1983. Defendants make three arguments for dismissal of plaintiff's § 1983 claims. First, they argue that plaintiff's Complaint fails to allege that the shooting officers are not protected by qualified immunity. Doc. 30 at 10–14, 18–20; Doc. 32 at 17–26, 29–34. Second, defendants contend that plaintiff has failed to allege a constitutional violation adequately against the non-shooting officers. Doc. 30 at 14–16; Doc. 32 at 26–29. The claim against the non-shooting officers theorizes that they failed to intervene to prevent the shooting officers from shooting Mr. Jennings. Third, defendants argue that Ottawa

---

[4] The Ottawa Defendants make much of plaintiff not alleging exactly which defendants actually shot Mr. Jennings. Doc. 30 at 9–10. The Ottawa Defendants cite *Robbins v. Oklahoma* for the proposition that plaintiff must allege which specific defendant violated a specific constitutional right belonging to Mr. Jennings. 519 F.3d 1242, 1250 (10th Cir. 2008). But, in that case, the plaintiffs alleged that "Defendants" had violated their constitutional rights and made "no distinction as to what acts [were] attributable to whom." *Id.* Here, plaintiff specifically alleges which defendants fired their weapons. Although plaintiff never specifically alleges which defendant fired the bullets that actually struck Mr. Jennings, plaintiff plausibly has alleged that the defendants who fired their weapons hit Mr. Jennings. That is all plaintiff needs to do at this stage of the litigation.

[5] Plaintiff concedes that any official capacity suits against the individual defendants under Counts I and II would be redundant, but explains that the Complaint asserts no such claims. The court thus analyzes the claims against the individual defendants only in their individual capacities.

and Franklin County can incur no liability on a theory that they failed to train their officers. Doc. 30 at 20–23; Doc. 32 at 34–38.

The court addresses these three arguments in turn, in subsections 1, 2, and 3 of this section.

### 1.    Qualified Immunity on the Excessive Use of Force

Qualified immunity protects officers from suit when the officer's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015). "The plaintiff bears the burden of establishing both (1) that the defendant violated a constitutional right and (2) that the right had been clearly established by the time of the violation." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015). Here, the Complaint alleges that the shooting officers "violated Mr. Jennings's clearly established right to be free from excessive force." Doc. 21 ¶ 64. Defendants respond, alleging that (1) the Complaint alleges no violation of Mr. Jennings's right to be free from excessive force and (2) even if the Complaint does allege a constitutional violation, it does not allege the shooting officers violated clearly established law.

### a.    Constitutionally Excessive Force

A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.[6] *Cty. of L.A., Cal. v. Mendez*, 137 S. Ct. 1539, 1546 (2017). "Determining whether the force used to affect a particular seizure is

---

[6]     Plaintiff also alleges a violation of the Fourteenth Amendment. However, for an excessive force claim "in the course of making an arrest, investigatory stop, or other 'seizure' of his person," a plaintiff only can claim a Fourth Amendment violation. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"). When an officer uses excessive force to kill an individual, a seizure has occurred. *See Stewart v. City of Prairie Vill., Kan.*, 904 F. Supp. 2d 1143, 1153 (D. Kan. 2012). Since the plaintiff's claim here arises from officers using allegedly excessive force to kill Mr. Jennings, the Fourth, not the Fourteenth, Amendment governs this claim.

'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* That an officer made a mistake about the need for force does not decide the question conclusively; rather the situation must be analyzed as a reasonable officer would analyze it in the heat of the moment. *Id.* at 396–97.

Also, it does not matter what actions the officers took that might have contributed to the reasonable need to use force. *See Mendez*, 137 S. Ct. at 1547. In *Mendez*, the Supreme Court held that law enforcement officers cannot incur liability under § 1983 if they use reasonable force even when they intentionally or recklessly provoked violent conduct. *Id.* The Court noted the sole consideration under the Fourth Amendment is reasonableness and any subjective intent of the officers must not be considered. *Id.* at 1548. For this reason, the court does not consider whether plaintiff has alleged facts capable of supporting a finding or inference that the officers acted recklessly to create the need for lethal force. The court only analyzes whether plaintiff has alleged facts that permit a finding or inference that the use of force was objectively unreasonable.

When dealing with deadly force, a reasonable officer may use deadly force if, knowing the facts as the officer on the scene knew them, the officer "had probable cause to believe that there was a *threat of serious physical harm to [himself]* or to others." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (internal quotations omitted). Determining this question

depends—in part—on the following factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Tenorio*, 802 F.3d at 1163 (quoting *Estate of Larsen*, 511 F.3d at 1260). And, while these four factors "are quite significant" ones, they are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justifies the use of force.'" *Id.* at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260).

In *Tenorio*, the Circuit affirmed a district court's decision denying summary judgment based on qualified immunity. *Id.* at 1166. The district court had concluded that a jury reasonably could find that the officer lacked probable cause to believe that the individual presented a threat of serious physical harm to the officer or another. *Id.* at 1161. The Tenth Circuit affirmed this conclusion, *id.*, and its analysis significantly informs the court's holding here.

The suspect in *Tenorio* did not charge the officer, did not say anything threatening to the officer, took only three slow steps towards the officer, and made no threatening motions at the officer. *Id.* at 1166. *Tenorio* analogized that case to *Zuchel v. City & County of Denver, Colorado*, 997 F.2d 730 (10th Cir. 1993) where the Circuit affirmed a jury verdict concluding that an officer had used lethal force improperly against an individual. *Id.* The victim of lethal force (1) was holding a knife and not a gun, (2) had not charged the officer, and (3) had not made any slicing or stabbing motions at the officer. *Zuchel*, 997 F.2d at 735–36. Likewise, the Circuit affirmed a verdict finding that an officer had used unreasonable lethal force against an individual who possessed only a knife (although the shooting officer thought the individual had a gun), was

alleged only to have committed vehicular theft, had made no threats against others, did not advance on any of the officers, and was known to be simply suicidal, not homicidal. *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006).

In contrast, our Circuit has held that officers used deadly force permissibly when: (1) a suspect already had threatened violence against himself and others, (2) the officers responded to a late night emergency call, (3) the officers encountered the suspect with a knife over a foot long, (4) the officers repeatedly told the suspect to drop his knife to no avail, (5) the suspect was standing on steps above the officers, (6) the suspect pointed the blade towards the officers in a threatening manner, (7) the suspect turned towards the shooting officer and took a step towards him, and (8) the suspect and the shooting officer were some 7 to 20 feet apart. *Estate of Larsen*, 511 F.3d at 1260–61. The Tenth Circuit also has held deadly force was reasonably used when: (1) the suspect had a firearm, (2) the suspect previously had threatened his wife with the firearm, (3) the suspect had pointed the firearm at the officers shortly before the officers shot, (4) the suspect stated he would fire on himself and the officers, (5) the suspect refused to comply with police demands to drop his weapon, and (6) these things all happened within a few seconds. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318–19 (10th Cir. 2009).

Applying these binding authorities to the facts that govern the motions here does not produce a one-sided outcome. One factor from *Estate of Larsen*'s formulation favors the defendants' motion. But the other three factors favor the conclusion that plaintiff has pleaded facts capable of supporting a finding that the officers used lethal force unreasonably.

The first factor asks whether the officers ordered Mr. Jennings "to drop his weapon, and [did he comply] with police commands?" *Estate of Larsen*, 511 F.3d at 1260. The Complaint alleges that the officers ordered Mr. Jennings to show his hands—the functional equivalent of a

13

police command to drop any weapons. Mr. Jennings did not respond and, indeed, he kept one hand tucked inside his waistband. Later, he removed his hand from his waistband and "started to point his hand toward several officers located to his west." Doc. 21 ¶ 47. The facts alleged by the Complaint cannot support a finding that the responding officer failed to comply with this factor. It favors granting the defendants' motions.

The second factor asks whether Mr. Jennings made "any hostile motions" towards the officers "with the weapon." *Estate of Larsen*, 511 F.3d at 1260. At first blush, this factor also seems to favor the officers' use of lethal force. Mr. Jennings pointed his hand at the officers. But, as it turned out, he held no weapon in it. Instead, he held a pair of sunglasses. The court recognizes that officers "need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Id.* But the larger factual context—at least as judged by the allegations in the Complaint—refutes the first-blush conclusion. As the Circuit has emphasized, officers may use deadly force "only if there is 'probable cause to believe that there [is] a *threat of serious physical harm to [the officers]* or to others.'" *Tenorio*, 802 F.3d at 1164 (quoting *Estate of Larsen*, 511 F.3d at 1260). The Complaint here alleges facts that the officers had positioned themselves 30 yards away from Mr. Jennings, and had taken shelter behind a building and their patrol cars. Time will tell whether plaintiff can muster evidence to support these allegations. But, for now, the court must presume they are true. And, if a jury were to accredit those allegations at a trial, they would support a reasonable finding that the officers lacked probable cause to perceive a threat of "serious physical harm." The facts pertinent to this factor, at least as alleged, disfavor a finding that lethal force was justified.

The third factor turns on the distance separating the officers and Mr. Jennings. Here, the controlling allegations assert that 30 yards separated the officers from Mr. Jennings. Naturally,

the danger presented by a gun—the weapon that at least some officers believed Mr. Jennings had in his waistband—tips the balance toward the officers. But other alleged facts support the opposite side of the scale. Namely, the officers occupied sheltered positions and no facts alleged in the Complaint suggest that Mr. Jennings was closing the distance or otherwise nullifying the shelter that the officers occupied. In short, some of plaintiff's allegations favor the officers on this factor. But others favor an inference that the officers used lethal force unreasonably. Applying this factor at this case's procedural stage, the court concludes that this factor favors plaintiff, but just slightly.

The fourth factor inquires into "the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. The facts alleged establish, for purposes of these motions, that three of the responding officers had responded to Mr. Jennings's suicide attempt the night before. Also, one of Mr. Jennings's caretakers informed the responding officers that Mr. Jennings was trying to bait the officers into shooting him. And, Mr. Jennings's conduct seemed to confirm this assertion. When an officer retrieved a beanbag gun from his patrol car, Mr. Jennings called out to him, "Don't beanbag me, [expletive]." The inference favoring the plaintiff infers that Mr. Jennings meant for these words to ask the officers to shoot him with a real gun, *i.e.*, commit "suicide by cop." After the officers shot Mr. Jennings with the beanbag gun, no one reported he had threatened anyone. But, he did point his hand at the officers and they saw something in his hand that—they thought at the time—looked like a gun. So, while the factual allegations about Mr. Jennings's intentions are mixed, at least some of them favor a finding that he wanted to harm no one but himself.

In sum, one factor—the first—supports a finding that the officers had probable cause to believe that Mr. Jennings presented a threat of serious harm to the officers and thus they used

lethal force reasonably. The other three factors present mostly mixed questions but, on balance, each of the three factors weighs against defendants' motions. Keeping in mind that these "four factors are only aids in making the ultimate determination," *Estate of Larsen*, 511 F.3d at 1260, the court cannot conclude from the totality of the circumstances alleged that plaintiff has failed to state a claim that the officers used lethal force unreasonably. Too many allegations—if backed up with admissible evidence and believed by a jury—could support a conclusion that the total circumstances did not justify the use of lethal force. Again, the court emphasizes that this conclusion does not mean plaintiff will prevail. Instead, it means merely that plaintiff's claim should survive the threshold motions presented at this stage of this case.

### b. Clearly Established Right

For a statutory or constitutional right to achieve "clearly established" status, the existing precedent must make the right one that is beyond debate to a reasonable officer. *Id.* Also, the right at issue cannot be defined at a high level of generality; rather the existing precedent must be "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Thus, the existing precedent either must involve materially similar facts or establish when the officer's conduct obviously violates the law. *White*, 137 S. Ct. at 552. Qualifying precedent usually comes from cases decided by the Supreme Court or the Tenth Circuit, but it also can come from clearly established case law in other circuits. *Roska ex rel. Roska v.*

*Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003). The right also must be clearly established at the time the officer took the challenged action. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017). In short, "only the plainly incompetent or those who knowingly violate the law" do not qualify for qualified immunity. *Id.*

In *Mullenix*, for example, the Supreme Court rejected the Fifth Circuit's characterization of the constitutional right at issue. *Mullenix*, 136 S. Ct. at 309. The Fifth Circuit had characterized the right asserted by the plaintiff as a right to be free from "deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 308–09 (quoting lower court opinion) (internal quotations omitted). The Supreme Court instead formulated the right in this fashion: a right to be free from deadly force when the officer "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer . . . ." *Id.* at 309. The Court held that no precedent clearly established this right. *Id.* at 309–10.

Here, the shooting officers violated a constitutional right, recognized by clearly established law. When the shooting occurred in 2014, the law allowed officers to use force when an individual was about to use force against the officers or others. *See, e.g.*, *Estate of Larsen*, 511 F.3d at 1260–61. In 2014, clear law prohibited officers from using force on an individual who did not have a gun and was known to be suicidal instead of homicidal. *See, e.g.*, *Walker*, 451 F.3d at 1160. Here, the court characterizes the right at issue as a right to be free from deadly force when a suspect did not show his hands after officers had received a report that the suspect possessed a gun, but the officers were 30 yards away in protected positions, Mr. Jennings did not charge the officers, Mr. Jennings was known to the officers to be suicidal, and

Mr. Jennings did not threaten anyone. As demonstrated by the case law outlined above, Mr. Jennings had a clearly established right to be free from excessive force under these circumstances. Because the Complaint alleges a constitutional violation of clearly established law, Count I sufficiently alleges a violation of § 1983.

### 2. Failure to Intervene

An officer can be liable for another officer's use of excessive force if the bystanding officer fails to intervene to prevent another officer from using excessive force. *Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014). To hold a bystanding officer liable, that officer must have a "realistic opportunity" to prevent the excessive force and knowledge that excessive force would be used. *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015).

Here, the non-shooting officers had no realistic opportunity to prevent the constitutional violation of excessive force. The Complaint alleges the entire incident lasted 17 minutes. But, the activity that triggered the need for lethal force lasted only a few seconds. Even taking plaintiff's allegations as true, no pleaded facts provide a basis to find or infer that the non-shooting officers knew that the shooting officers did not intend to use deadly force until Mr. Jennings pulled his hand out of his pocket. At that moment, the shooting officers fired and used deadly force. While the non-shooting officers might have realized that Mr. Jennings was pulling sunglasses out of his pocket, no realistic opportunity existed for them to prevent the excessive force alleged. The Complaint thus alleges no opportunity where the non-shooting officers could have intervened to prevent the shooting.

Plaintiff argues that this case is similar to *Stewart v. City of Prairie Village, Kan.*, 904 F. Supp. 2d 1143 (D. Kan. 2012). Doc. 34 at 18. *Stewart* survived a motion to dismiss. But it differs from this case in material respects. In *Stewart*, the Complaint alleged a build-up to the

shooting that did not occur here. The individual had barricaded herself in her house when the police knocked down the door and entered. *Stewart*, 904 F. Supp. 2d at 1152. The officers took a baseball bat and broom handle that she was using to provoke the officers. *Id.* The officers used TASERs as well. *Id.* When the individual tried to pick up a knife, the officer fired on her. *Id.* The district court held that the Complaint adequately alleged that the other officers could have prevented the entry (which was against police policy), prevented the shooting officer from drawing his gun after the TASERs were deployed, or stopped the officer from following the individual after she ran away. *Id.* at 1158. Thus, our court held, the Complaint sufficiently alleged that the bystanding officers had failed to intervene. *Id.*

Here, the Complaint alleges no critical moments when the non-shooting officers could have intervened to prevent the shooting. The Complaint alleges the officers involved simply surrounded Mr. Jennings. They did not break through a door. The officers drew their guns shortly after the officers arrived on the scene. The officers did not follow Mr. Jennings unnecessarily—he already was out in the open. Even accepting all allegations as true, nothing it alleges indicated the shooting officers would fire at Mr. Jennings before he pulled something out of his waistband. Thus, the non-shooting officers did not fail to intervene.

### 3.     Municipal Liability

Next, plaintiff asserts that Franklin County and the City of Ottawa violated Mr. Jennings's constitutional rights because their official policies failed to train their officers how to use the Crisis Intervention Technique ("CIT"). Doc. 21 at 16. A municipality is liable under § 1983 only when its custom or policy directly causes a constitutional violation. *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017). One such custom is the failure to train or supervise officers adequately. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Under Tenth

Circuit precedent, a municipality is liable for failing to train officers in the use of force only when (1) the officers exceeded the constitutional limits of force, (2) the excessive force occurred in a typical and recurring situation for police officers, (3) the city was deliberately indifferent about the need for training that would have prevented the excessive force, and (4) the lack of training directly caused the use of excessive force.  *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

As already explained, the Complaint here plausibly alleges the officers exceeded the constitutional limit of force.  *See* Part III.A.i., *supra*.  The Complaint also plausibly alleges that excessive force was used in a typical and recurring situation for police officers.  Doc. 21 ¶ 76.  Defendants' argument focuses on the last two requirements.  They argue that the Complaint does not allege that Ottawa and Franklin County were deliberately indifferent to the need for training officers in CIT.  Doc. 30 at 22; Doc. 32 at 3.  Defendants next argue that this lack of training could not have caused Mr. Jennings's death.  Doc. 32 at 37.  The Franklin Defendants also argue that the governing law will not permit the Board of County Commissioners to be held liable for actions taken by the Deputy Sheriffs.  *Id.* at 35.  The court addresses all three arguments, in turn, in the following three subsections.

### a.    Deliberate Indifference

A municipality can be held liable for its failure to train officers only if the municipality is "'deliberately indifferent to the need' for further training or supervision."  *Bryson*, 627 F.3d at 789 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  The municipality must have had notice of the need for training through either a pattern of constitutional violations or constitutional violations that are plainly obvious or highly predictable.  *Id.* (quoting *Barney v.*

*Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998)). The municipality then must choose—consciously or deliberately—to disregard the need for training. *Id.*

In *Bryson*, the Tenth Circuit affirmed a district court's decision to grant summary judgment against a deliberate indifference claim. The district court had granted summary judgment because it found no deliberate indifference to the need to train forensic chemists where one of its chemists had presented false evidence that resulted in plaintiff's wrongful conviction. *Id.* The court found plaintiff had adduced no evidence of a pattern of constitutional violations, nor of knowledge by the city of a need for additional training of forensic chemists. *Id.*

Here, plaintiff asserts deliberate indifference based on the allegation that there are a "high frequency of encounters between law enforcement officers and persons who are suicidal, mentally ill, or in other crisis situations and how traditional law enforcement techniques are wholly inadequate to diffuse the dangerousness of such situations." Doc. 21 ¶ 76. In addition, plaintiff alleges that Ottawa and Franklin County deliberately have chosen to ignore the need to train their officers to cope with the mentally ill. *Id.* at ¶ 79. Thus, plaintiff has alleged facts that, if supported by evidence and believed by the factfinder, could support a reasonable inference that Ottawa and Franklin County deliberately chose to ignore the need for training.

### b. Causation

Next, the Franklin Defendants argue that Franklin County and Ottawa's failure to train their officers in CIT did not cause Mr. Jennings's death. Doc. 32 at 37. They contend that the Complaint does not identify the specific CIT training that would have prevented Mr. Jennings's death. *Id.* They also argue that the Complaint does not allege the municipalities' failure to train caused Mr. Jennings's death because the Complaint alleges an Ottawa Police officer took CIT training.

As for the Franklin Defendants' first argument, the Complaint alleges that CIT training is "appropriate for dealing with [situations involving the mentally ill]." Doc. 21 ¶ 76. The Complaint thus alleges that the officers, had they received this training, would not have shot Mr. Jennings. The Franklin Defendants cite *Lopez v LeMaster*, 172 F.3d 756 (10th Cir. 1999), to support their proposition that plaintiff must allege the specific training that the officers lacked. But, *Lopez* affirmed a district court's decision to grant *summary judgment* because plaintiff could identify no specific training the municipality had omitted and thus that caused a violation of plaintiff's constitutional rights. *Id.* at 760. To survive a motion to dismiss, a plaintiff need only allege sufficient facts to "give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Carter*, 667 F. Supp. 2d at 1262 (internal citation and quotation marks omitted). The Complaint here meets this requirement.

As for the Franklin Defendants' second argument, the Complaint never alleges that the officer who received CIT training was present at the scene of the shooting. In addition, plaintiff has alleged facts that, if supported by evidence and believed by the factfinder, could support a reasonable inference that Mr. Jennings would not have been killed if more officers and deputies had received CIT training. The Complaint thus sufficiently alleges a causal connection between the lack of training and Mr. Jennings's death.

### c.     Board Control Over the Deputies

The Franklin Defendants argue that the Board cannot be held liable for a policy which caused Mr. Jennings's constitutional violation because they do not set policy for the deputies: the Sheriff does. Doc. 32 at 35. "[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 784 (1997) (citing *Monell v. N.Y.C. Dep't Soc. Servs.*, 436 U.S. 658, 694 (1978)). In instances where it is possible

that the state government was the policy maker, a court must determine whether the local governmental unit or the state government was the final policy maker "in a particular area, or on a particular issue." *Id.* at 785. State law governs this analysis. *Id.* at 786.

The Franklin Defendants argue that under Kansas Statute Annotated § 19-805(a), the Franklin Deputies are under the control of the county Sheriff, not the Board of County Commissioners. Doc. 32 at 35. The court agrees with the Franklin Defendants, but finds Kansas Statute Annotated § 19-805(b) more instructive on the issue than § 19-805(a). Section 19-805(b) provides:

> Within the limitations of the budget for financing of the operation of the sheriff's office as approved by the board of county commissioners, the sheriff may attend and *may require* the undersheriff, deputies and any assistants to attend any meeting or seminars which the sheriff determines will be beneficial to the operation of the sheriff's office.

(emphasis added). Here, the Complaint alleges the deputies should have been trained in CIT. But as a matter of Kansas law, the Board of County Commissioners had no authority to train the officers because the Sheriff, not the Board, possessed the authority to require the Deputy Sheriffs to attend meetings or seminars. Since the Sheriff is a state official independent of the Board of County Commissioners, *Board of County Commissioners of County of Lincoln v. Nielander*, 62 P.3d 247, 261 (Kan. 2003), the Board cannot incur § 1983 liability for a failure to train the deputies in CIT.

## B. ADA Claims

Plaintiff also asserts that defendants violated Mr. Jennings's rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act because, either, they incorrectly perceived the effects of Mr. Jennings's disability as illegal conduct or failed to accommodate Mr. Jennings's disability reasonably. Doc. 21 ¶ 87. To state a claim under the ADA and the

Rehabilitation Act[7], the plaintiff must allege "(1) he is a qualified individual with a disability; (2) he was either excluded from participating in or denied the benefits of some public entity's[8] services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999) (internal brackets omitted). A public entity need not permit an individual to benefit from public services if that individual represents a direct threat to the health or safety of others. 28 C.F.R. § 35.139(a). A direct threat to the health or safety of others occurs when "a significant risk [exists] to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provisions of auxiliary aids or services." *Id.* § 35.104.

Defendants contend that the ADA does not apply in situations where police officers face violent conduct. Doc. 30 at 25, Doc. 32 at 38–39. No Supreme Court or Tenth Circuit precedent addresses this question directly. *See Sheehan*, 135 S. Ct. at 1773–74 (declining to decide whether a public entity can be held liable under the ADA for an arrest made by its police officers); *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 (10th Cir. 2015) (assuming, but not deciding, "that accommodations may be necessary when disabled individuals are arrested"). Every circuit that has reached this issue has held that an arrest is a public benefit that falls within the scope of the ADA. *See, e.g.*, *Sheehan v. City & Cty. of S.F.*, 743 F.3d 1211, 1231–32 (9th Cir. 2014) (cataloging cases), *rev'd on other grounds*, 135 S. Ct. 1765 (2015).

The difference among the circuits is the rule that applies to when exigent circumstances exist. Most circuits hold that an exigency is a circumstance that courts must take into account

---

[7]    The court analyzes these claims together because the standards governing both are the same. *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1303 (D. Kan. 2005).

[8]    Defendants also argue that none of the individual officers can incur liability under the ADA because the ADA applies only to public entities and not individuals. Doc. 30 at 25–26; Doc. 32 at 39. This is correct, *see City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1773 (2015), and plaintiff does not appear to contest this point. Therefore, the court dismisses the ADA claim asserted against the individual defendants and only analyzes the ADA claim against Franklin County and Ottawa.

when deciding which reasonable accommodations a public entity must make.  *See, e.g.*, *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084 (11th Cir. 2007).  The Fifth Circuit takes a different approach, holding that the ADA does not apply to police officers making an on-the-street response until they have secured the scene.  *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) (holding ADA did not apply to an officer encounter where the individual was walking towards an officer with a knife and did not drop the knife when told to do so).  The Sixth Circuit also follows a slightly different path, holding a disabled individual's disability was not the cause of an officer shooting.  *Thompson v. Williamson Cty., Tenn.*, 219 F.3d 555, 558 (6th Cir. 2000). Instead, the Sixth Circuit reasoned, the individual's failure to disarm was the cause.  *Id.*  Our court has faced this question in a case where an individual approached officers while holding a knife.  *Sudac v. Hoang*, 378 F. Supp. 2d 1298, 1306 (D. Kan. 2005) (granting summary judgment).  These circumstances led the officers to shoot the individual.  *Id.*  Judge Lungstrum reasoned that the officers did not owe an ADA duty to accommodate the individual in this situation because of the threatening manner he presented.  *Id.*  He thus applied the logic of *Hainze* and *Thompson*.  *Id.*

The court finds *Sudac* persuasive and concludes that it applies the rule that our Circuit, if faced with the question, would adopt.  The court thus holds that the ADA applies to arrests unless an exigency exists.  Applying that rule here, plaintiff has alleged sufficient facts that, if supported by evidence and accredited by the factfinder, could support a finding that Mr. Jennings did not present an imminent threat to himself or others.  These allegations prevent the court from granting a Motion to Dismiss the ADA claim against Ottawa and Franklin County. [9]

---

[9]     The Franklin Defendants argue that Mr. Jennings cannot be found to be a "qualified individual" because he was a threat to the health and safety of others.  Doc. 32 at 40.  This analysis is similar to the one applied above and so, Mr. Jennings is a qualified individual for the same reason the Complaint adequately alleges that there was no exigency existed.

### C. State Law Claims

Finally, defendants ask the court to dismiss (or grant judgment on the pleadings) against plaintiff's state law claims for wrongful death by battery and negligence. Specifically, defendants argue that (1) the court lacks jurisdiction over these claims, (2) plaintiff's battery theory fails because the officers' conduct was privileged,[10] (3) the negligence theory fails because the officers had no special relationship to Mr. Jennings, and (4) the plaintiff lacks standing under the Kansas Wrongful Death Statute. The court addresses each argument, below, and rejects all four arguments.

#### 1. Supplemental Jurisdiction

The court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). A related provision, § 1367 provides: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (holding that a district court has "[p]endent jurisdiction" over state law claims in a case if subject matter jurisdiction exists over the federal claim and the "state and federal claims [] derive from a common nucleus of operative fact"). Here, plaintiff's state law claims revolve around the same operative facts as his federal claims: the shooting of Mr. Jennings. This means the court thus has jurisdiction over plaintiff's common law claims under § 1367.

---

[10] The Ottawa Defendants concede their argument that the statute of limitations expired and bars plaintiff's wrongful death based on battery claim. Doc. 36 at 13.

## 2.     Battery

The Franklin Defendants argue that the shooting officer's conduct was privileged and thus not actionable. They premise this argument on a principle in Kansas law permitting an officer to use deadly force when the officer "reasonably believes that such force is necessary to prevent death or great bodily harm" to another. *Fry ex rel. Estate of Fry v. City of Galena, Kan.*, 450 F. Supp. 2d 1236, 1246 (D. Kan. 2006). As already explained, plaintiff has alleged sufficient facts to permit a reasonable factfinder to find—if plaintiff supports the Complaint's allegations with evidence—that the officers did not reasonably believe that deadly force was necessary. *See* Part III.A.i., *supra*. This conclusion precludes the motions' attack on the Complaint's battery-based theory.

## 3.     Negligence

The defendants make two arguments to support their motion asking to dismiss plaintiff's negligence claim. First, they claim that plaintiff did not allege a special relationship between the officers and Mr. Jennings, and such relationship is a prerequisite for a negligence action against law enforcement officers. Doc. 30 at 27; Doc. 34 at 42. Second, they argue the officers are protected by immunity under the Kansas Tort Claims Act ("KTCA"). Doc. 30 at 28; Doc. 32 at 42.

On defendants' first point, they start from a correct premise. In Kansas, police officers enjoy a general immunity against "claims arising from performance or nonperformance of [the] officer's general duties to prevent crime and enforce the laws." *Dauffenbach v. City of Wichita*, 667 P.2d 380, 385 (Kan. 1983). But this immunity yields to the potential for liability where the officer "breaches a specific or special duty owed an individual." *Id.* Such a duty arises in two circumstances: "(1) where there is an affirmative act by the officer causing injury; and (2) when

a specific promise or representation by the officer is made under circumstances creating justifiable reliance." *Id.* (citing Arizona and New Mexico law). For obvious reasons, the analysis here turns on the first of these two alternatives.

The Kansas Supreme Court has provided examples when this alternative would apply, *i.e.*, when an officer "plac[es] an individual under arrest or commit[s] an assault." *Id.* The Kansas Supreme Court sharpened the point, directing the analysis to "[a] line of Kansas cases which recognize that an officer is liable for false arrest or the unnecessary use of force [which] lends support to the existence of a special duty from such affirmative acts." *Id.* (citing Kansas cases).

Applying these Kansas tort principles to the Complaint here, plaintiff has alleged facts which, if proven true, could support a finding that the shooting officers used force unnecessarily. *See* part IV.A.1.a., *supra*. This conclusion means that plaintiff has alleged sufficient facts to give rise to the "special duty" recognized by Kansas law. It also means that plaintiff adequately has pleaded facts that could render the shooting officers liable for negligence. The court thus denies defendants' motions as they apply to the shooting officers. Conversely, plaintiff has failed to allege any facts that legally could support this prerequisite to liability against the non-shooting officers. So, the court grants the motions for the non-shooting officers.

This takes the analysis to defendants' second argument—that the KTCA immunizes the officers from liability. *See* Doc. 30 at 28; Doc. 32 at 42. This statute immunizes officers from liability under what Kansas law calls discretionary function immunity. Kan. Stat. Ann. § 75-6104(e). But this form of immunity does not protect an officer who acts needlessly. *Hopkins v. Kansas*, 702 P.2d 311, 319 (Kan. 1985) ("If the officers acted needlessly, maliciously, or wantonly, resulting in injury to the plaintiff's property, the officers acted outside the protections

of the act."). Our court has recognized that discretionary function immunity does not extend to "a law enforcement officer who uses an unreasonable amount of force . . . ." *Fry ex rel. Estate of Fry v. City of Galena, Kan.*, 450 F. Supp. 2d 1236, 1247 (D. Kan. 2006) (citing Kansas Supreme Court cases).

The court already has concluded that the pleaded facts, if proven and accredited by the factfinder, can support a finding that the shooting officers used unreasonable force. This conclusion nullifies the shooting-officers' access to immunity under the KTCA on a motion to dismiss. But this form of immunity protects the non-shooting officers. Therefore, the court grants the motion to dismiss plaintiff's wrongful death by negligence claim of the non-shooting officers, but denies it with respect to the shooting officers.

### 4. No Standing

This leaves the Ottawa Defendants' argument that Mr. McHenry lacks standing to bring an action for Mr. Jennings's wrongful death. These defendants argue that Mr. McHenry, to have standing to sue, must designate himself as an heir of Mr. Jennings in the caption of the Complaint. Doc. 30 at 28. The Ottawa Defendants cite no authority as support for the proposition that the Complaint's *caption* must contain this designation. And the court can find none.

The Federal Rules of Civil Procedure govern pleadings filed in federal civil cases. Rule 10(a) requires the "title of the complaint" to "name all the parties." The Complaint here does as much. *See* Doc. 21 at 1. Neither this rule nor any other cited by the Ottawa Defendants require the Complaint's caption or title to recite a party's capacity to sue. And, the Complaint explicitly pleads plaintiff's capacity as administrator of Mr. Jennings's estate and his status as Mr. Jennings's heir. *Id.* at ¶ 3.

Arguments that "would exalt form over substance" are not favorites of our court. *Melcher v. United States*, No. 12-1183-EFM-GLR, 2012 WL 5289627, at *3 (D. Kan. Oct. 23, 2012). The Ottawa Defendants' argument tries to do precisely that.

## V.    Conclusion

For the reasons explained above, the court grants in part and denies in part defendants' Motion to Dismiss and Motion for Judgment on the Pleadings. The court grants the defendants' motions with respect to plaintiff's failure to intervene in the use of excessive force claim (Count II) against Officers Waterman, Hart, Butters, Dryden, and Woods. The court grants defendants' motions with respect to plaintiff's § 1983 municipal liability claim (Count III) against the Franklin County Board of County Commissioners. The court grants defendants' motions with respect to plaintiff's Americans with Disabilities Act and Rehabilitation Act claims (Count IV) against the individual defendants. Finally, the court grants defendants' motions with respect to plaintiff's wrongful death by negligence claim (Count VI) against Officers Waterman, Hart, Butters, Dryden, and Woods. Otherwise, the court denies the motions.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Ottawa Defendants' Motion to Dismiss (Doc. 29) is granted in part and denied in part.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the Franklin County Defendants' Motion for Judgment on the Pleadings (Doc. 31) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 26th day of September, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
